KYLE SCHUMACHER (BAR #121887)
kyle@schumacherlane.com
**SCHUMACHER LANE PLLC**
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax

Attorneys for Plaintiff
Tsheng Yang

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON – EUGENE DIVISION

| | |
|---|---|
| Tsheng Yang**,**<br><br>                    Plaintiff,<br><br>        v.<br><br>Equifax Information Services, LLC;<br>TransUnion, LLC; First Premier Bank;<br>American Express National Bank;<br>LoanCare, LLC; Bank of America, N.A.;<br>and DOES 1 through 100 inclusive,<br><br>                    Defendants. | CASE NO. 6:21-cv-01116<br><br>PLAINTIFF'S COMPLAINT FOR DAMAGES:<br><br>    1.  Violation of Fair Credit Reporting Act |

COMES NOW Plaintiff **TSHENG YANG** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

**<u>INTRODUCTION</u>**

1.      This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debts.

2.      Defendant Bank of America, N.A. ("BOA") is not reporting Plaintiff's account accurately as it was included and discharged in bankruptcy.

3.      Defendant First Premier Bank ("First Premier") is not reporting Plaintiff's account accurately as paid or settled as agreed.

4.     Defendant American Express National Bank ("AMEX") is not reporting Plaintiff's account accurately as paid or settled as agreed.

5.     Defendant LoanCare, LLC ("LoanCare") is not reporting Plaintiff's account accurately as the home subject to this mortgage was sold and the debt was paid in full and satisfied.

6.     The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

7.     A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

8.     The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

9.     In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

10.     Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

11.     Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

12.     This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

13.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

14.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

15.     This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

16.     Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

17.     Plaintiff alleges that the BOA account was included in Plaintiff's Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged and satisfied.

18.     Plaintiff alleges that BOA is reporting a charge off current payment status on a debt that was discharged in her chapter 7 bankruptcy.

19.     Plaintiff alleges that the AMEX account was fully satisfied as paid or settled and legally paid in full for less than the full amount in or about July of 2019, and as such is not currently past due.

20.     Plaintiff alleges that in the alternative, if any amount remained on the AMEX account after the settlement, which she alleges there was none, said amount was included in Plaintiff's Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

21.     Plaintiff alleges that AMEX is incorrectly reporting a past due payment status on a debt which was satisfied, or in the alternative, discharged in her chapter 7 bankruptcy.

22.     Plaintiff alleges that the First Premier account was fully satisfied as paid or settled and legally paid in full for less than the full amount in or about September of 2017, and as such was not included and discharged in her subsequent bankruptcy.

23.     Plaintiff alleges that First Premier is reporting her debt as included and discharged in bankruptcy, despite the fact this debt was satisfied prior to her bankruptcy filing.

24.     Plaintiff alleges her LoanCare account was a mortgage burdening a home which was sold in or about January of 2020, when LoanCare was paid in full and the account was satisfied, and as such the account is not currently past due.

25. Plaintiff alleges that LoanCare is reporting her debt which was satisfied and paid in full as currently past due.

26. Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

27. Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

28. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her FICO Score.

29. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

30. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  FICO, Inc.**

31. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

32. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.

33. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

34. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

35.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

36.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

37.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

38.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

39.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with credit reporting industry standards.

40.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

41.     Each of the five (5) factors is weighted differently by FICO.

42.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

43.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

44.     Repeated derogatory payment history (e.g., repeated monthly "CO" notations) increases the recency and frequency calculation; therefore, repeated negative items in the payment history is more sever and detrimental to a FICO Score.

45.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

46.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

47.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

48.     The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the *filing date*, under both Chapters, to determine how long ago the bankruptcy took place.

49.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See https://www.myfico.com/credit-education/what-is-a-fico-score.* If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See Id.*

**B.     Metro 2**

50.     The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

51.     The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner.

52.     The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting. While CDIA's Metro 2 format is intended to standardize credit reporting, this standard is still subject to the FCRA's requirement of *maximum possible accuracy and completeness.*

53.     The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt.

54.     The CDIA is experienced in credit reporting. In support of this allegation, Plaintiff avers the following:

a.     The CDIA offers a FCRA certificate program for all CRAs.

b.    The CDIA offers a FCRA awareness program for all CRAs.

c.    The CDIA offers a FCRA certificate program for DFs.

d.    The CDIA offers a FCRA awareness program for DFs.

e.    The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

f.    The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

g.    The CDIA developed a credit reporting resource guide for accurately reporting credit.

55.    The CDIA's Metro 2 format is accepted by all CRAs.

56.    The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

57.    The CRRG outlines the industry standards for reporting debts using Metro 2 format.

58.    The CRRG is not readily available to the public. It can be purchased for $229.45.

59.    Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will <u>not</u> grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

60.    When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

61.    The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

62.    If the Metro 2 data received by FICO deviates from the FCRA requirements or industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

C.    e-OSCAR

63.    e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

64.     When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

65.     The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

66.     When a data furnisher reports on a consumer's account, it sends an automated universal datafrom ("AUD") to each CRA.

67.     For clarification, an AUD is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**D.      Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

68.     When a consumer files bankruptcy, certain credit reporting industry standards exist.

69.     Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

70.     The Consumer Information Indicator ("CII") is a critical field in the Metro 2 format that indicates a special condition that applies to a specific consumer.

71.     Under Metro 2, the CII must be reported on only the consumer to whom the information applies.

72.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

73.     In the consumer bankruptcy context, CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed and is active, but no discharge has been entered.

74.     CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed and is active, but no discharge has been entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a tradeline. Such reporting alerts any potential lender that the account is no longer in a collectable status and is being handled by a Chapter 13 trustee.

75.     The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed, but the chapter is undesignated/unknown.

76.     The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

77.     The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged. In addition, post discharged balances and past due balances should be updated to reflect zero (0) balances. The payment history should also not reflect missed payments moving forward.

78.     The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

79.     The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

80.     Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent *in personam* collection activity.

81.     Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

82.     The FRCA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was *filed*.

83.     A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

84.     The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

85.     Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

///

///

///

///

///

///

///

**E.    Plaintiff's Debts were Discharged Pursuant to her Bankruptcy**

86.    Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on March 30, 2020 in order to repair her creditworthiness and FICO Score.

87.    Plaintiff listed BOA and AMEX on Schedule E/F of her bankruptcy petition as each holding a nonpriority unsecured claim.[1]

88.    Plaintiff's bankruptcy was discharged on July 7, 2020.

**F.    Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

89.    On October 2, 2020, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "October 2 Credit Reports").

90.    Plaintiff noticed adverse tradelines in her October 2 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

91.    Plaintiff then disputed the inaccurate tradelines via certified mail to Equifax and TransUnion on or about January 8, 2021 (the "First Dispute Letter").

92.    Regarding the Equifax report, Plaintiff's First Dispute Letter specifically put AMEX and LoanCare on notice that Plaintiff's accounts were inaccurately reported as past due.

93.    Regarding the TransUnion report, Plaintiff's First Dispute Letter specifically put AMEX, BOA, and LoanCare on notice that Plaintiff's accounts were inaccurately reported as past due.

94.    Plaintiff's First Dispute Letter also detailed what was perceived to be problematic about the accounts, addressing each tradeline individually.

95.    Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

96.    Plaintiff is informed and believes that Equifax received Plaintiff's First Dispute Letter and, in response, sent Plaintiff's dispute to AMEX and LoanCare, as the data furnishers, via an ACDV through e-OSCAR.

---

[1] Plaintiff had more than one AMEX debt. Further, although Plaintiff alleges she paid the AMEX debt in or about July of 2019, out of an abundance of caution, she listed them in her bankruptcy schedules in order to provide appropriate notice.

97. Plaintiff is informed and believes that TransUnion received Plaintiff's First Dispute Letter and, in response, sent Plaintiff's dispute to AMEX, BOA, and LoanCare, as the data furnishers, via an ACDV through e-OSCAR.

98. On February 12, 2021, Plaintiff ordered a second three-bureau credit report from Experian to determine if her accounts were updated (the "February 12 Credit Reports").

99. Plaintiff then disputed additional inaccurate tradelines via certified mail to Equifax on or about March 21, 2021 ("Second Dispute Letter").

100. Plaintiff's Second Dispute Letter specifically put First Premier on notice that Plaintiff paid the account and it was not a charge off.

101. Plaintiff is informed and believes that Equifax received Plaintiff's Second Dispute Letter and, in response, sent Plaintiff's dispute to First Premier, as the data furnisher, via an ACDV through e-OSCAR.

102. On April 27, 2021, Plaintiff ordered a third three-bureau credit report from Experian to determine if her accounts were updated.

103. Plaintiff then disputed additional inaccurate tradelines via certified mail to Equifax on or about June 9, 2021 ("Third Dispute Letter").

104. Plaintiff's Third Dispute Letter specifically put LoanCare on additional notice that Plaintiff paid the account in full and it was not past due. Plaintiff included a copy of the sale and payoff with her Third Dispute Letter.

105. Plaintiff is informed and believes that Equifax received Plaintiff's Third Dispute Letter and, in response, sent Plaintiff's dispute to LoanCare, as the data furnisher, via an ACDV through e-OSCAR.

106. On July 27, 2021, Plaintiff ordered a fourth three-bureau credit report from Experian to determine if her accounts were updated.

**a.     Inaccuracy – BOA**

107. Despite actual knowledge, BOA continued to report Plaintiff's account, beginning in XXXX, to TransUnion with a current payment status of "Charged off as bad debt." Further, BOA is not reporting Plaintiff's bankruptcy. This is patently incorrect as this account was discharged.

108. Plaintiff alleges that BOA did not investigate whether Plaintiff filed for bankruptcy.

109.     BOA did not update the tradeline to reflect that Plaintiff obtained a discharge in bankruptcy.

110.     TransUnion provided notice to BOA that Plaintiff was disputing the inaccurate and misleading information, but BOA failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

111.     Based on Plaintiff's dispute, BOA should have known that Plaintiff received a discharge in her bankruptcy proceedings.

112.     The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a chapter 7 bankruptcy and received her discharged in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

113.     Plaintiff alleges that BOA did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

114.     If BOA reviewed such standards, BOA would have seen that its reporting was not in compliance and was therefore patently incorrect or incomplete.

115.     BOA should have updated the CII to Metro 2 Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy and removed the charge off payment status.

116.     By continuing to report Plaintiff's account to TransUnion with a charge off current payment status, it appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy and may still be collectible, which is inaccurate.

117.     Further, as this inaccurate reporting is being used to calculate Plaintiff's FICO Score, the FICO Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

118.     As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status reported by BOA on the account is lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

119.     The lack of investigation and reporting of inaccurate and incomplete information by BOA is unreasonable.

### b.      Inaccuracy – AMEX

120.    Despite actual knowledge, Defendant AMEX continued to report Plaintiff's account, beginning in 34999XXXXXXXXXXX, to Equifax with a current payment status of "not more than three payments past due". This is patently incorrect as this debt was paid and satisfied in or about July of 2019.

121.    Despite actual knowledge, Defendant AMEX continued to report Plaintiff's account, beginning in 349992XXXXXXXXXXX, to TransUnon with a current payment status of "60 days past due". This is patently incorrect as this debt was paid and satisfied in or about July of 2019.

122.    Plaintiff alleges that AMEX did not investigate whether Plaintiff previously paid and satisfied the account.

123.    AMEX did not update the tradeline to reflect that Plaintiff paid and satisfied the account.

124.    Equifax and TransUnion both provided notice to AMEX that Plaintiff was disputing the inaccurate and misleading information, but AMEX failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

125.    The most basic investigation would include a simple review of internal documentation on the account (i.e., the fact the account was paid and satisfied) compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

126.    Plaintiff alleges that AMEX did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

127.    If AMEX reviewed such standards, or its own internal records regarding Plaintiff's account, AMEX would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

128.    In the alternative, if any amount remained after Plaintiff paid and satisfied the account in July of 2019, said amount would have been discharged in her subsequent chapter 7 bankruptcy. In that event, AMEX should have updated the CII to Metro 2 Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy and removed the past due payment status.

129. By reporting Plaintiff's account with a current payment status as past due, it appears to third parties viewing Plaintiff's credit report that the account was not paid and satisfied but is instead still past due, which is patently incorrect.

130. Further, as AMEX's inaccurate reporting is being used to calculate Plaintiff's FICO Score, the FICO Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

131. Past due debts are far more injurious to a credit score than a satisfied debt. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status and bankruptcy references reported by AMEX is effectively lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

132. The lack of investigation and reporting of inaccurate and incomplete information by AMEX is unreasonable.

**c.    Inaccuracy – First Premier**

133. Despite actual knowledge, Defendant First Premier continued to report Plaintiff's account, beginning in 517800XXXXXXXXXX, to Equifax with a current payment status of "Included in bankruptcy" and a comment of "Bankruptcy Chapter 7". This is patently incorrect as this debt was paid and satisfied in or about September of 2017.

134. Plaintiff alleges that her February 12 Credit Reports for Equifax included a comment that showed "Settlement accepted on this account" and Plaintiff disputed the payment status being reported as "Charge-off." After the dispute, First Premier updated the tradeline on Equifax to reflect as if the account was discharged in bankruptcy.

135. Plaintiff alleges that First Premier did not investigate whether Plaintiff previously paid and satisfied the account.

136. First Premier did not update the tradeline to reflect that Plaintiff paid and satisfied the account.

137. Equifax provided notice to First Premier that Plaintiff was disputing the inaccurate and misleading information, but First Premier failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

138. The most basic investigation would include a simple review of internal documentation on the account (i.e., the fact the account was paid and satisfied) compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

139. Plaintiff alleges that First Premier did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

140. If First Premier reviewed such standards, or its own internal records regarding Plaintiff's account, First Premier would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

141. By reporting Plaintiff's account as if it was included and discharged in bankruptcy, it appears to third parties viewing Plaintiff's credit report that the account was not paid and satisfied but was instead discharged, which is patently incorrect.

142. Further, as First Premier's inaccurate reporting is being used to calculate Plaintiff's FICO Score, the FICO Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

143. Discharged debts are far more injurious to a credit score than a satisfied debt. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status and bankruptcy references reported by First Premier is effectively lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

144. The lack of investigation and reporting of inaccurate and incomplete information by First Premier is unreasonable.

**d.    Inaccuracy – LoanCare**

145. Despite actual knowledge, Defendant LoanCare continued to report Plaintiff's account, beginning in 623003XXXXXXX, to Equifax with a current payment status of "not more than three payments past due." This is patently incorrect as this debt was paid and satisfied in or about January of 2020.

146. Plaintiff alleges that LoanCare did not investigate whether Plaintiff previously paid and satisfied the account.

147.    LoanCare did not update the tradeline to reflect that Plaintiff paid and satisfied the account.

148.    On two separate occasions, both Equifax and TransUnion provided notice to LoanCare that Plaintiff was disputing the inaccurate and misleading information, but LoanCare failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

149.    The most basic investigation would include a simple review of internal documentation on the account (i.e., the fact the account was paid and satisfied) compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

150.    Plaintiff alleges that LoanCare did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

151.    If LoanCare reviewed such standards, or its own internal records regarding Plaintiff's account, LoanCare would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

152.    By reporting Plaintiff's account with a current payment status as past due, it appears to third parties viewing Plaintiff's credit report that the account was not paid and satisfied but is instead still past due, which is patently incorrect.

153.    Further, as LoanCare's inaccurate reporting is being used to calculate Plaintiff's FICO Score, the FICO Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

154.    Past due debts are far more injurious to a credit score than a satisfied debt. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status and bankruptcy references reported by LoanCare is effectively lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

155.    The lack of investigation and reporting of inaccurate and incomplete information by LoanCare is unreasonable.

///

### G. Damages

156. Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

157. As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

158. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by BOA.

159. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by AMEX.

160. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by First Premier.

161. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by LoanCare.

162. BOA's, AMEX's, First Premier's, and LoanCare's respective actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**FIRST CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))**

**(Against Defendants and Does 1-100)**

163. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

### A. Equifax and TransUnion Each Failed to Assure Credit Reporting Accuracy

164. Equifax and TransUnion (collectively, the "CRA Defendants") each violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

165. Had Equifax maintained reasonable procedures to assure maximum accuracy, it would never have never allowed AMEX, First Premier, or LoanCare to report their respective accounts as described herein.

166.    Equifax knew, or should have known, (1) that the AMEX account was paid and satisfied, and (2) that the AMEX account should not have been reported as past due on account of the satisfaction. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect maximum possible accuracy and completeness as required by the FCRA.

167.    Equifax knew, or should have known, (1) that the First Premier account was paid and satisfied, and (2) that the First Premier account should not have been reported as discharged in bankruptcy on account of the satisfaction. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect maximum possible accuracy and completeness as required by the FCRA.

168.    Equifax knew, or should have known, (1) that the LoanCare account was paid and satisfied, and (2) that the LoanCare account should not have been reported as past due on account of the satisfaction. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect maximum possible accuracy and completeness as required by the FCRA.

169.    Had TransUnion maintained reasonable procedures to assure maximum accuracy, it would never have never allowed AMEX or BOA to report their respective accounts as described herein.

170.    TransUnion knew, or should have known, (1) that the AMEX account was paid and satisfied, and (2) that the AMEX account should not have been reported as past due on account of the satisfaction. Further, TransUnion knew, or should have known, that this inaccurate and incomplete tradeline does not reflect maximum possible accuracy and completeness as required by the FCRA.

171.    TransUnion knew, or should have known, (1) that the BOA account was included and discharged in bankruptcy, and (2) that the BOA account should not have been reported as past due on account of the Chapter 7 discharge. Further, TransUnion knew, or should have known, that this inaccurate and incomplete tradeline does not reflect maximum possible accuracy and completeness as required by the FCRA.

172.    Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019). The investigation and evaluation of Plaintiff's credit worthiness, credit standing, credit

capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting that Equifax and TransUnion each allowed.

173.    As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.    Willful Violations**

174.    The CRA Defendants' violations, as described herein, were willful; specifically, the CRA Defendants have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

175.    The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the disputes. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

176.    To the extent the CRA Defendants do send consumer disputes, they send these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

177.    The CRA Defendants' employees receive little to no training concerning how to accurately report consumer debt.

178.    Instead, the CRA Defendants' employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

179.    The CRA Defendants' employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

180.    The CRA Defendants have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

181.    As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

182.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

183.    In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

184.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

**(Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))**

**(Against Defendants and Does 1-100)**

185.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    BOA Failed to Reinvestigate Following Plaintiff's Dispute**

186.    Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

187.    BOA sent an AUD to TransUnion reporting the account payment status as charged off. Once noticed of the bankruptcy proceedings, BOA continued to report the current payment status as charged off to TransUnion.

188.    After receiving the First Dispute Letter, BOA did not correct the payment status on the TransUnion report, nor did it add a bankruptcy notation. Instead BOA verified and re-reported the inaccurate payment status of "Charged off as bad debt" via ACDV to TransUnion.

189.    The payment status reported in an AUD or ACDV represents the status of the account at the time of sending the AUD or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, the fact that the account may have previously been charged off, if at all, has no bearing on its current pay status after a bankruptcy discharge.

190.    Once the account was discharged, the account should be reported to reflect the discharge.

191.     BOA violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

192.     TransUnion provided notice to BOA that Plaintiff was disputing the inaccurate and misleading information; however, BOA failed to conduct a reasonable investigation as required by the FCRA.

193.     Based on Plaintiff's dispute, review of its internal records on the account, and notices received during the bankruptcy, BOA should have known its account was included and discharged in Plaintiff's Chapter 7 bankruptcy and ceased its inaccurate reporting.

194.     Reporting a discharged debt as if it is currently charged off is patently incorrect as it appears that it is still collectible and outstanding. In addition, this incorrect reporting also adversely affects credit decisions. Payment history (including payment status), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, BOA's reporting as described herein has a direct adverse effect on Plaintiff's FICO Score and her ability to rebuild her credit score and obtain new credit.

195.     The lack of investigation by BOA, as required by the FCRA, is unreasonable.

**B.      AMEX Failed to Reinvestigate Following Plaintiff's Dispute**

196.     Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

197.     AMEX sent an AUD to Equifax and TransUnion reporting the account payment status as past due. After receiving payment and in or about July 2019, the account was satisfied. After satisfaction on the account, AMEX continued to report the current payment status as past due to Equifax and TransUnion.

198.     After receiving the First Dispute Letter, AMEX did not correct the payment status on the Equifax or TransUnion reports. Instead AMEX verified and re-reported the inaccurate

payment status of "not more than three payments past due" via ACDV to Equifax and as "60 days past due" via ACDV to TransUnion.

199.     The payment status reported in an AUD or ACDV represents the status of the account at the time of sending the AUD or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, the fact that the account may have previously been past due, if at all, has no bearing on its current pay status after payment and satisfaction of the account.

200.     Once the account was satisfied, the account should be reported to reflect the payment and satisfaction.

201.     In the alternative, if AMEX believed any amount to remain after the July 2019 payment, AMEX was noticed of the bankruptcy and should have reported the debt accurately as included and discharged in bankruptcy.

202.     AMEX violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

203.     Equifax and TransUnion both provided notice to AMEX that Plaintiff was disputing the inaccurate and misleading information; however, AMEX failed to conduct a reasonable investigation as required by the FCRA.

204.     Based on Plaintiff's disputes and review of its internal records on the account, AMEX should have known its account was paid and satisfied, and ceased its inaccurate reporting.

205.     Reporting a paid or satisfied debt as if it is currently past due is patently incorrect. In addition, this incorrect reporting also adversely affects credit decisions. Payment history (including payment status), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, AMEX's reporting as described herein has a direct adverse effect on Plaintiff's FICO Score and her ability to rebuild her credit score and obtain new credit.

206.     The lack of investigation by AMEX, as required by the FCRA, is unreasonable.

///

///

**C.     First Premier Failed to Reinvestigate Following Plaintiff's Dispute**

207.    Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

208.    In or about September of 2017, after receiving payment in satisfaction of the account, First Premier sent an AUD to Experian reporting the account payment status as "Legally paid in full for less than the full balance", and sent an AUD to TransUnion reporting the account payment status as "Payment after charge off / collections." However, the AUD First Premier sent to Equifax reported the account payment status as "Charge-off." The AUD First Premier sent to Equifax noted in a comment that "settlement was accepted on the account."

209.    After receiving the Second Dispute Letter, First Premier did not correct the payment status on the Equifax report. Instead First Premier sent an ACDV to Equifax which incorrectly changed the account payment status to "Included in bankruptcy" and deleted the settlement comment by replacing it with a comment stating "Bankruptcy Chapter 7."

210.    The payment status reported in an AUD or ACDV represents the status of the account at the time of sending the AUD or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, the fact that the account may have previously been charged off, if at all, has no bearing on its current pay status after payment and satisfaction of the account.

211.    Once the account was satisfied, the account should be reported to reflect the payment and satisfaction. A subsequent bankruptcy does not change the fact the account was already satisfied and closed.

212.    First Premier violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

213.    Equifax provided notice to First Premier that Plaintiff was disputing the inaccurate and misleading information; however, First Premier failed to conduct a reasonable investigation as required by the FCRA.

214. Based on Plaintiff's dispute, review of its internal records on the account, and its own reporting on the same account to Experian and TransUnion, First Premier should have known its account was paid and satisfied, and ceased its inaccurate reporting.

215. Reporting a paid or satisfied debt as if it was discharged in bankruptcy is patently incorrect. In addition, this incorrect reporting also adversely affects credit decisions. Payment history (including payment status), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, First Premier's reporting as described herein has a direct adverse effect on Plaintiff's FICO Score and her ability to rebuild her credit score and obtain new credit.

216. The lack of investigation by First Premier, as required by the FCRA, is unreasonable.

**D.    LoanCare Failed to Reinvestigate Following Plaintiff's Dispute**

217. Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

218. LoanCare sent an AUD to the Credit Reporting Agencies reporting the account payment status as past due. After receiving payment and in or about January 2020, the account was satisfied. After satisfaction on the account, LoanCare sent an AUD to Experian reporting the current payment status as "Paid, was past due 60 days." However, the AUD LoanCare sent to TransUnion reported the current payment status as "60 days past due" and the AUD LoanCare sent to Equifax reported the current payment status as "not more than three payments past due."

219. After receiving the First Dispute Letter, LoanCare did not correct the payment status on the Equifax or TransUnion reports. Instead LoanCare verified and re-reported the inaccurate past due payment statuses via ACDVs to Equifax and TransUnion.

220. After receiving the Third Dispute Letter, LoanCare deleted the tradeline on the TransUnion report but did not correct the payment status on the Equifax report. Instead LoanCare verified and re-reported the inaccurate past due payment status via ACDV to Equifax.

221.    The payment status reported in an AUD or ACDV represents the status of the account at the time of sending the AUD or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, the fact that the account may have previously been past due, if at all, has no bearing on its current pay status after payment and satisfaction of the account.

222.    Once the account was satisfied, the account should be reported to reflect the payment and satisfaction.

223.    In the alternative, in the event Equifax failed to comply with its statutory duty to forward Plaintiff's dispute letter to LoanCare and LoanCare only received an ACDV from TransUnion, LoanCare still had a duty to correct and update reporting to all credit bureaus under 15 U.S.C. § 1681s-2(b)(1)(D), which it failed to do.

224.    LoanCare violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

225.    On two separate occasions both Equifax and TransUnion provided notice to LoanCare that Plaintiff was disputing the inaccurate and misleading information; however, LoanCare failed to conduct a reasonable investigation as required by the FCRA.

226.    Based on Plaintiff's disputes, review of its internal records on the account, and its reporting to Experian, LoanCare should have known its account was paid and satisfied, and ceased its inaccurate reporting.

227.    Reporting a paid or satisfied debt as if it is currently past due is patently incorrect. In addition, this incorrect reporting also adversely affects credit decisions. Payment history (including payment status), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, LoanCare's reporting as described herein has a direct adverse effect on Plaintiff's FICO Score and her ability to rebuild her credit score and obtain new credit.

228.    The lack of investigation by LoanCare, as required by the FCRA, is unreasonable.

///

///

## E.    Willful Violations

229.    Plaintiff alleges that BOA, AMEX, First Premier, and LoanCare each have reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

230.    Plaintiff further alleges that BOA, AMEX, First Premier, and LoanCare each have not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, has developed reckless policies and procedures.

231.    Plaintiff alleges that rather than train its employees on accurate credit reporting and industry standards, BOA's, AMEX's, First Premier's, and LoanCare's respective employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

232.    In the alternative, BOA, AMEX, First Premier, and LoanCare were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

## F.    Equifax and TransUnion Each Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)

233.    Pursuant to 15 U.S.C. 1681i(a)(1), Equifx was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the AMEX, First Premier, and LoanCare accounts.

234.    Pursuant to 15 U.S.C. 1681i(a)(1), TransUnion was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the AMEX and BOA accounts

235.    Thus, the CRA Defendants each failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

236.    The CRA Defendants are not a passive entities bound to report whatever information a data furnisher provides.

237.    Plaintiff alleges the CRA Defendants are readily familiar with FCRA requirements and credit reporting industry standards.

238.    Based on the foregoing, Plaintiff alleges that the CRA Defendants can, and do, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

239.     The CRA Defendants can and do instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

240.     Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that AMEX, First Premier, and LoanCare were not reporting their respective accounts at issue correctly.

241.     Had Equifax conducted a proper investigation it could have closed or bookended the AMEX account by adding a notation on the credit report on its tradeline that the debt was in fact paid and satisfied and not currently past due. However, it continued to report the account as described herein.

242.     Had Equifax conducted a proper investigation it could have closed or bookended the First Premier account by adding a notation on the credit report on its tradeline that the debt was in fact paid and satisfied and not discharged in bankruptcy. However, it continued to report the account as described herein

243.     Had Equifax conducted a proper investigation it could have closed or bookended the LoanCare account by adding a notation on the credit report on its tradeline that the debt was in fact paid and satisfied and not currently past due. However, it continued to report the account as described herein.

244.     Had TransUnion conducted a proper investigation it could have closed or bookended the BOA account by adding a notation on the credit report on its tradeline that the debt was in fact discharged in in Plaintiff's Chapter 7 bankruptcy and not currently past due. However, it continued to report the account as described herein.

245.     Had TransUnion conducted a proper investigation it could have closed or bookended the AMEX account by adding a notation on the credit report on its tradeline that the debt was in fact paid and satisfied and not currently past due. However, it continued to report the account as described herein.

246.     The CRA Defendants, therefore, did not conduct even the most basic investigations regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

///

///

///

## THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

247.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     Equifax and TransUnion Each Failed to Review and Consider all Relevant Information**

248.     The CRA Defendants each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

249.     The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.     Willful Violations**

250.     The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

251.     In the alternative, the CRA Defendants were each negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

252.     Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

253.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     Equifax and TransUnion Each Failed to Delete Disputed and Inaccurate Information**

254.     The CRA Defendants each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

255.    The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

256.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

257.    In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

258.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**PRAYER FOR RELIEF**

259.    WHEREFORE, Plaintiff prays for judgment as follows:

    a.  For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

    b.  Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

    c.  Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

    d.  Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

    e.  For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

    f.  For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.


Respectfully submitted,


**SCHUMACHER LANE PLLC**


Dated: July 29, 2021            */s/ Kyle Schumacher*
                                  Kyle Schumacher
                                  Attorney for Plaintiff

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial of this matter by jury.


**SCHUMACHER LANE PLLC**


Dated: July 29, 2021                    *<u>/s/ Kyle Schumacher</u>*
                                        Kyle Schumacher
                                        Attorney for Plaintiff